[relates to Docket Item 58]

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ALLEN J. FARMER, | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 06-3084 (JBS) |
| v. | : | |
| GEORGE W. HAYMAN and RICHARD WASIK | : | **OPINION** |
| Defendants. | : | |

APPEARANCES:

Mr. Allen J. Farmer
50 N. Delaware Drive
Apt. 3
Easton, PA 18042
    Plaintiff pro se

Susan Marie Scott, Esq.
Office of the NJ Attorney General
RJ Hughes Justice Complex
PO Box 112
Trenton, NJ 08625
    Attorney for Defendants

**SIMANDLE**, District Judge:

     Plaintiff Allen J. Farmer, pro se, brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his civil rights when he was confined at a halfway house called Talbot Hall.  Presently before the Court is Defendants' motion to dismiss and/or for summary judgment [Docket Item 58].  This sad case raises issues regarding the forceful actions that may be taken by corrections officers against a prisoner who is

attempting to kill himself.  For the following reasons, the Court will grant Defendants' motion for summary judgment.

**I.   BACKGROUND**

**A.   Facts**

At the time that the events underlying Plaintiff's Complaint occurred, he was in the custody of the New Jersey Department of Corrections ("DOC") after having been convicted of multiple counts of illegal drug possession, unlawful weapon possession, and assault on a police officer.  (Howells Decl. Ex. A.)  From July 19, 2005 to October 14, 2005, Mr. Farmer was confined at Talbot Hall, a halfway house where inmates are assessed to determine where they might be placed after their release from prison.  (Compl. 5.)  Mr. Farmer, who claims to have a history of mental illness, alleges that while he was confined at Talbot Hall, he made a request to see a mental health professional, but "Talbot Hall staff" refused this request.  (Farmer Aff. 2.)  Mr. Farmer also claims that Talbot Hall staff "antagonize[d]" him and "coerc[ed]" him into committing suicide.  (Id.)

On October 14, 2005, Mr. Farmer received a disciplinary charge for "refusing to work or to accept a program or housing unit assignment," and it was determined that he would be returned to Northern State Prison ("NSP").  (Randolph Decl. Ex. A 24.)  Mr. Farmer was kept in Talbot Hall's "Holding Room Area" to await the arrival of the NSP officers who were to transport him to the

2

prison.  (Id. at 1; Farmer Aff. 2.)  At approximately 3:05 p.m., Dondi Jenkins, a Talbot Hall Supervisor, observed that Mr. Farmer was sitting in the holding room with the lights off.  (Randolph Decl. Ex. A 1.)  When Mr. Jenkins attempted to turn the lights on, he realized that Mr. Farmer had broken the light fixture and removed the broken glass from the fluorescent light bulb in the holding room; Mr. Jenkins further observed that Mr. Farmer had removed his shirt and collected the glass shards in it.  (Id.; Farmer Aff. 2.)  Mr. Farmer began to cut his wrists with the broken glass.  (Farmer Aff. 3.)  Mr. Jenkins contacted Keith Hooper, the Assistant Director of Talbot Hall, who arrived at the holding room to find Mr. Farmer holding a shard of glass in his hand, with the shirt containing more broken glass on the floor. (Randolph Decl. Ex. A 1.)  Mr. Hooper ordered Mr. Farmer to drop the glass and permit the officers to search him, but Mr. Farmer refused, stating that he did not want to be searched or touched. (Id. at 2.)  Mr. Farmer then removed more shards of glass from his pants pocket and placed them in his mouth, telling the officers that he would swallow the glass "[i]f anyone trie[d] to rush in on [him]" so that they would be responsible for his death.  (Id.; Farmer Aff. 3.)  Mr. Farmer continued to cut himself on his wrist as various members of the Talbot Hall staff urged him to stop.  (Id.)

By this time, NSP Officers Richard Wasik and Frank Remisio had arrived at Talbot Hall to transport Mr. Farmer to NSP, and the officers were apprised of Mr. Farmer's actions.  (Id.) Officer Wasik contacted NSP to request that backup units be sent to Talbot Hall, and contacted the Adult Diagnostic and Treatment Center Northern Regional Unit, located behind Talbot Hall, to request mace or pepper spray.  (Randolph Decl. Ex. A 2.)  Officer Wasik then entered the holding room and ordered Mr. Farmer to drop the glass in his hand, spit out the glass in his mouth, and, according to Mr. Farmer, threatened that he would shoot Mr. Farmer in the neck if he did not comply.  (Farmer Aff. 3-4.)  Mr. Farmer further alleges that Officer Wasik called him a "fucken nigger[,] . . . a snitch and a homo," and stated that the staff should let Mr. Farmer "continue slicing his body and eat all the glass he wants."  (Am. Compl. 9.)  Mr. Farmer ignored Officer Wasik's order, turned away, and continued to cut himself.  (Id. at 4.)  According to Mr. Farmer, by this time he had "managed to cut the main artery in his wrist enough to squirt blood."  (Id.)

Shortly thereafter, Sergeant Haskins arrived with the mace that Officer Wasik had requested.  (Randolph Decl. Ex. A 2.)  For the fourth time, Mr. Farmer was ordered to drop the glass shards, and he again refused to comply, stating to the officers, "You motherfuckers are going to have to kill me."  (Id.; Farmer Aff. 4.)  Sergeant Haskins then used the mace spray on Mr. Farmer.

4

(Id.; Farmer Aff. 4.)  Officers Wasik and Remisio then attempted
to restrain Mr. Farmer, and a struggle ensued as Mr. Farmer
resisted the officers' efforts to handcuff him.  (Id.)  During
the struggle, which Mr. Farmer describes as an "assault," Mr.
Farmer swung the piece of glass at the officers.  (Id.)
Ultimately, the officers managed to restrain Mr. Farmer and place
him in handcuffs, and he was "dragged," at times by his hair, to
the shower in order to rinse off the mace.  (Id.)  Mr. Farmer
continued to struggle with the officers in the shower, where he
attempted to bite Officer Wasik, and the officers restrained Mr.
Farmer on the floor of the shower to prevent him from biting
them.[1]  (Id.)

        After being rinsed off in the shower, Mr. Farmer was taken
to the medical office at Talbot Hall, where he was treated for
his self-inflicted injuries and the injuries he received during
his struggle with the corrections officers.  (Id.)  He was then
transported by ambulance to the University of Medicine and
Dentistry of New Jersey Hospital in Newark, New Jersey for
treatment and observation, where he remained overnight.
(Randolph Decl. Ex. A 2; Farmer Aff. 5.)  Officers Wasik and
Remisio were treated at Talbot Hall for injuries they suffered

---

        [1]  As with the officers' first attempt to handcuff him, Mr.
Farmer describes the struggle in the shower as an "assault."
(Farmer Aff. 4.)  He does not appear to deny that he sought to
bite Officer Wasik while the officers attempted to rinse the mace
off of him.

during the struggle, which included a cut to Officer Wasik's arm
and a bruise on Officer Remisio's leg.  (Randolph Decl. Ex. A 2.)
According to Mr. Farmer, he suffered injuries to his neck and
back as a result of the incident, underwent six to eight weeks of
physical therapy, and still experiences pain.  (Farmer Aff. 5.)

**B.   Procedural History**

On July 6, 2006, Mr. Farmer filed a Complaint with this
Court, naming as defendants George W. Hayman, Commissioner for
the DOC; Talbot Hall administrators John J. Clancy and Keith
Hooper; and Officer Wasik [Docket Item 1].  His Complaint, which
appeared to assert violations of the Cruel and Unusual Punishment
Clause of the Eighth Amendment, sought the following relief: (1)
"the filing of this action in forma pauperis," (2) that "a trial
. . . be had," and (3) that the defendants be suspended from
employment "until a full investigation has been completed."
(Compl. 10.)  On July 20, 2006, the Court granted Mr. Farmer's
application to proceed in forma pauperis and dismissed his claim
against Officer Wasik based on verbal harassment [Docket Items 2
and 3].

On February 28, 2007, Defendants Clancy and Hooper moved to
dismiss Plaintiff's complaint against them pursuant to Rule
12(b)(1) [Docket Item 31], arguing that the Court lacked
jurisdiction to grant the injunctive relief Mr. Farmer sought –
the suspension of Defendants Clancy and Hooper from employment –

because Mr. Farmer was no longer incarcerated at Talbot Hall, had no personal stake in the defendants' suspension, and therefore lacked standing. In its July 13, 2007 Opinion and Order [Docket Items 40 and 41], the Court granted the defendants' motion to dismiss.

On September 14, 2007, Plaintiff filed an Amended Complaint, naming Hayman and Wasik as defendants and seeking punitive and compensatory damages as relief. (Am. Compl. 10.) Defendants Hayman and Wasik submitted the motion to dismiss and/or for summary judgment presently before the Court on November 30, 2007 [Docket Item 58]. Plaintiff failed to oppose Defendants' motion.

## II. DISCUSSION

Plaintiff's Amended Complaint, brought pursuant to 42 U.S.C. § 1983, asserts five counts against Defendant Hayman and one count against Defendant Wasik. Plaintiff's claims against Defendant Hayman allege that as Commissioner for the DOC, he is liable for: (1) Plaintiff's placement in Talbot Hall, a facility that "was not equipped even in a minimal regard to deal with the issues that plagued the plaintiff/Farmer" (Count One); (2) Plaintiff's placement in the holding room with access to light bulbs, which gave Plaintiff "the ability to inflict suicide attempts" (Count Two); (3) the failure of Talbot Hall staff to provide Plaintiff with "mental health medications" (Count Three); (4) the failure to provide Plaintiff with access to mental health

7

staff (Count Four); and (5) the failure to protect Plaintiff from being verbally abused (Count Five).  (Am. Compl. 4-6.)  Plaintiff alleges that Defendant Wasik assaulted him, "render[ing] a racial beating."  (Id. at 7.)  Defendants moved to dismiss and/or for summary judgment.  The Court treats Defendants' motion as a motion for summary judgment and will grant the motion.

**A.    Summary Judgment Standard**

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to material facts."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the nonmoving party fails to oppose the motion by evidence such as written objection, memorandum, or affidavits, the court "will accept as true all material facts set forth by the moving party with appropriate record support." Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990) (quoting Jaroma v. Massey, 873 F.2d 17, 21 (1st Cir. 1989)).  If the nonmoving party has failed to establish a triable issue of fact, summary judgment will be granted only if "appropriate" and if movants are entitled to a judgment as a matter of law.  Fed. R. Civ. Proc. 56(e); see Anchorage Assocs., 922 F.2d at 175.

### B.   Claims Against Defendant Hayman

Defendants argue that the claims Plaintiff asserts against Defendant Hayman must be dismissed because they are all premised exclusively upon a theory of respondeat superior liability, which is not cognizable under section 1983.[2]  Defendants cite Rode v.

---

[2]  Defendants make the threshold argument that to the extent that Plaintiff sues them in their official capacities, his suit is precluded by the Eleventh Amendment.  The Court agrees. Lawsuits brought under section 1983 seeking monetary relief "against state officials in their official capacity . . . should be treated as suits against the State," Hafer v. Melo, 502 U.S. 21, 25 (1991), and are barred by the Eleventh Amendment, Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 101 n.11 (1984).  Because the sole relief sought in Plaintiff's Amendment Complaint is monetary, his suit can proceed only if it is brought against Defendants in their individual capacities. The Court will thus treat Plaintiff's suit as one asserting claims against the defendants in their individual capacities.

Dellarciprete, 845 F.2d 1195 (3d Cir. 1988), for the proposition that the defendant in a civil rights action must be personally involved with the allegedly unlawful conduct in question, making supervisory liability unavailable in a section 1983 action. While "actual knowledge and acquiescence" on the part of the supervisor may be sufficient to establish such personal involvement under section 1983, Defendants argue that Plaintiff has not alleged facts sufficient to indicate such knowledge or acquiescence on Defendant Hayman's part.  As Defendants reason, "Plaintiff has failed to allege that Defendant Hayman directed a subordinate to act in a way that would deprive Plaintiff of his constitutional rights . . . or that he had a policy or custom of allowing contracted halfway houses to ignore or refuse to attend to the medical needs of inmates." (Defs.' Br. 14.)  Instead, according to Defendants, Plaintiff's claims assert that Defendant Hayman should be held liable for Plaintiff's alleged injuries solely on account of his supervisory role at the Department of Corrections.  Section 1983 does not countenance such a theory of liability, Defendants argue, and Plaintiff's claims against Defendant Hayman should be dismissed.

The Court agrees that Plaintiff has failed to allege or introduce facts to suggest that Defendant Hayman was personally involved in the allegedly unlawful conduct underlying his Complaint, and will dismiss Plaintiff's claims against Defendant

Hayman.  It is well-established that "[s]ection 1983 will not support a claim based on a respondeat superior theory of liability." Polk County v. Dodson, 454 U.S. 312, 325 (1981); see also Dellarciprete, 845 F.2d at 1207.  For this reason, as the Court of Appeals stated in Dellarciprete, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs," which "can be shown through allegations of personal direction or of actual knowledge and acquiescence." 845 F.2d at 1207.  The allegations of personal involvement or knowledge and acquiescence must contain "actual facts, as opposed to conclusions, connecting [the supervising official to the action in question]." Evancho v. Fisher, 423 F.3d 347, 354 (3d Cir. 2005).  In other words, such allegations "must be made with appropriate particularity." Dellarciprete, 845 F.2d at 1207.

Plaintiff has not made such particular factual allegations, appearing instead to allege that Defendant Hayman should be held liable on account of his position as Commissioner for the DOC. As to Counts One, Three and Four of the Amended Complaint, for example, Plaintiff has not alleged that Mr. Hayman had personal knowledge of, or acquiesced to, the allegedly inadequate provision of mental health services and medication to Plaintiff at Talbot Hall.  (Am. Compl. 4-6.)  Likewise, as to Count Two, Plaintiff has alleged no particular facts to connect Defendant Hayman to the decision to place Plaintiff in a holding room with

11

"unrestricted access" to the light bulbs he used to cut himself on October 14, 2005.  (Id. at 5.)  Finally, as to Count Five, Plaintiff has alleged no facts suggesting that Defendant Hayman knew of or acquiesced to the "verbal[] abuse[]" to which Plaintiff claims he was subjected.  (Id. at 6.)  Defendant Hayman's ties to the violations Plaintiff alleges are thus limited to his supervisory capacity at the DOC.  Because a section 1983 civil rights action cannot be premised upon a theory of respondeat superior liability, and because Plaintiff has alleged no facts from which Defendant Hayman's "personal involvement in the alleged wrongs" could be inferred, the Court will dismiss Plaintiff's claims against Defendant Hayman. Dellarciprete, 845 F.2d at 1207.

**C.   Claim Against Defendant Wasik**

Plaintiff alleges that Defendant Wasik "render[ed] a racial beating" during the events of October 14, 2005, apparently arguing that Defendant Wasik's efforts to restrain Plaintiff that day violated the Eighth Amendment's prohibition against the use of excessive force.  (Am. Compl. 7.)  Defendant Wasik argues that he is entitled to qualified immunity because a reasonable corrections officer in his position would have believed that the conduct alleged by Plaintiff was lawful under the circumstances.[3]

---

[3]  Defendant Wasik first argues that he is entitled to summary judgment on the excessive force question.  In light of "the importance of resolving immunity questions at the earliest

The Court agrees that Defendant Wasik is entitled to qualified immunity and will thus dismiss Plaintiff's complaint against him.

### 1.    Qualified Immunity Standard

As an "accommodation of competing values," qualified immunity strikes a balance by permitting a plaintiff to recover for constitutional violations where the defendant officer was "plainly incompetent or . . . knowingly violate[d] the law," while immunizing an officer who "made a reasonable mistake about the legal constraints on his actions." Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted).  In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court described the two-step inquiry courts undertake in determining whether a governmental officer is entitled to qualified immunity.  First, the Court must address whether "the officer's conduct violated a constitutional right." Id. at 201. As the Court of Appeals noted in Curley, "the first step of the

---

possible stage in litigation," the Court addresses the immunity analysis at the outset.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Because, as is explained infra, the first step of the qualified immunity analysis "is not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity," Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007), the substantive issues in Defendants' motion for summary judgment are effectively subsumed within the immunity analysis.  See Thomas v. Ferguson, 361 F. Supp. 2d 435, 442 n.7 (D.N.J. 2004) (noting that "where malicious and sadistic use of force is the issue of the constitutional cause of action, the qualified immunity test collapses into the same test as that of the constitutional issue").

analysis addresses whether the force used by the officer was excessive," which is "not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity." Curley, 499 F.3d at 207. If in this first step the Court finds that there was no constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

"If, and only if, the court finds a violation of a constitutional right, the court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer from liability." Curley, 499 F.3d at 207 (quoting Scott v. Harris, --- U.S. ----, 127 S.Ct. 1769, 1774 (2007)). The inquiry under this second step addresses whether "the right was clearly established." Saucier, 533 U.S. at 201. The analysis of whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition," in order to assess "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02.

**2.   Application to Plaintiff's Excessive Force Claim**

Turning to the first step of the inquiry, the Court finds that Defendant Wasik did not violate Plaintiff's constitutional rights through the use of excessive force. As the Supreme Court

has observed, "[n]ot every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny," and "[a]fter incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment." Whitley v. Albers, 475 U.S. 312, 319 (1986) (internal quotations and citations omitted). Prison officials are accorded substantial latitude where prison security and the safety of prisoners and officers is at stake:

> The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.

Id.

In light of courts' "hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance," a prisoner alleging that an officer used excessive force in quelling a prison disturbance cannot merely question "the reasonableness of a particular use of force or the existence of arguably superior alternatives." Id. at 319, 322. Rather, in the prison disturbance context, a plaintiff alleging that an officer used excessive force must establish that the officer acted "maliciously and sadistically to cause harm," causing an injury that was "more than de minimis." Fuentes v. Wagner, 206 F.3d 335, 345 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 320-21).

15

> In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting

Whitley, 475 U.S. at 321).

Viewing the record in light of these factors, the Court finds that Defendant Wasik did not use excessive force. There is almost no material factual dispute between the parties as to what transpired on October 14, 2005. Prior to his encounter with Officer Wasik, Mr. Farmer was actively injuring himself with one shard of glass and threatening to inflict greater harm on himself by swallowing the glass in his mouth. (Farmer Aff. 3.) He does not deny that he swung the glass shard at the officers as they sought to restrain him, nor does he deny that he attempted to bite Defendant Wasik when the officers were attempting to rinse the mace off of him. In light of these undisputed facts, there can be little doubt that "the need for the application of force" was urgent on account of "the extent of the threat to the safety of staff and inmates" that Plaintiff's conduct posed. Kyler, 204 F.3d at 106 (citation omitted). Moreover, Plaintiff concedes that the officers made "efforts made to temper the severity of a forceful response," id., to the extent that he was ordered

16

numerous times to stop cutting himself and to drop the glass
before the mace or physical force was used.  (Farmer Aff. 2-3.)

While there is a semantic difference between the parties'
descriptions of the events – Plaintiff uses the word "assault"
(Farmer Aff. 4.), whereas Defendants describe trying to "gain
control of" Mr. Farmer, "struggl[ing]" with him, "wrestl[ing]"
him to the ground, and "restrain[ing]" him (Randolph Decl. Ex. A
2, 20) – this is insufficient to create a factual dispute as to
whether Defendant Wasik acted "maliciously and sadistically for
the very purpose of causing harm."  <u>Whitley</u>, 475 U.S. at 320-21.
In light of the injuries Plaintiff was inflicting on himself in
the moments preceding the use of force, and the announced
prospect of killing himself, it appears that inaction, rather
than the aggressive steps Plaintiff claims Defendant Wasik took,
would have been the surest means for a malicious officer to cause
Plaintiff the greatest harm.  There is absolutely no inference,
from any evidence in this case, that Plaintiff would have stopped
hurting himself and threatening others without the direct
application of force against him.  In any case, using mace and
struggling with an armed prisoner are manifestly "part and parcel
of a good-faith effort to restore prison security."  <u>Id.</u> at 326.

Plaintiff's submissions are insufficient to establish a
question of material fact as to whether Defendant Wasik
overstepped the "wide-ranging deference" accorded to prison

employees in the context of a serious disturbance.  Id. at 321.
He does not allege, for instance, that Defendant Wasik continued
to use force after Plaintiff "had already been subdued."[4]  Hope
v. Pelzer, 536 U.S. 730, 738 (2002).  Additionally, while the
injuries he claims to have suffered are more than de minimis,
they fall far short of the injuries alleged in other prison
disturbance cases in which the force used was found not to be
excessive.  See, e.g., Whitley, 475 U.S. at 324 (where prisoner
was shot in the leg in an effort to stop a prison riot, "the
order to shoot, qualified as it was by an instruction to shoot
low, falls short of commanding the infliction of pain in a wanton
and unnecessary fashion").

     The Court having determined that Defendant Wasik did not
violate Plaintiff's constitutional rights, "there is no necessity
for further inquiries concerning qualified immunity."[5]  Saucier,

---

     [4]  Although Plaintiff alleges in his Amended Complaint that
Defendant Wasik called him a "fucken nigger[,] . . . a snitch and
a homo," at some point during the events of October 14, 2005, he
makes no mention of these derogatory remarks in his affidavit.
(Am. Compl. 9.)  In any event, although the Court would find the
use of such language deplorable and offensive if it occurred, the
use of such language does not itself render the efforts to subdue
Plaintiff malicious or sadistic.  This was an emergency situation
of Plaintiff's own creation requiring forceful efforts to
convince Plaintiff to desist from killing himself.  If, after
direct commands to Plaintiff were ignored, Defendant Wasik tried
to distract him with such epithets, that strategy, even if
misguided, does not rise to the level of a constitutional
violation.

     [5]  The Court notes, however, that even if Defendant Wasik's
conduct were found to constitute an excessive use of force, he

18

533 U.S. at 201.  The Court accordingly finds that Defendant Wasik is entitled to qualified immunity and will dismiss Plaintiff's complaint.

**III. CONCLUSION**

For the reasons discussed above, the Court will grant the defendants' motion for summary judgment.  The accompanying Order will be entered.

<u>**January 11, 2008**</u>
Date

<u>**s/ Jerome B. Simandle**</u>
JEROME B. SIMANDLE
United States District Judge

---

would be entitled to qualified immunity, because it would not be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 201-02.  In light of the "wide-ranging deference" accorded to prison officers in the face of a disruption in prison security, <u>Whitley</u>, 475 U.S. at 321, an officer facing the unique emergency circumstances that confronted Defendant Wasik would have believed that the use of mace and the force that was used to subdue Plaintiff was lawful.